NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 63

Nos. 2017-131 & 2017-274

| | |
|---|---|
| Kirk Wool | Supreme Court |
| v. | On Appeal from<br>Superior Court, Washington Unit, |
| Andrew Pallito, Commissioner | Civil Division |
| Bernard Carter | January Term, 2018 |
| v. | |
| Lisa Menard, Commissioner | |

Mary Miles Teachout, J.

Kirk Wool, Pro Se, Camp Hill, Pennsylvania, Plaintiff-Appellant.

Bradley S. Stetler of Stetler, Allen & Kampmann, Burlington, for Plaintiff-Appellant Carter.

Thomas J. Donovan, Jr., Attorney General, and David McLean (2017-131), Assistant Attorney, Montpelier, and Emily A. Carr, Assistant Attorney General, Waterbury, for Defendant(s)-Appellee(s).

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **SKOGLUND, J.** Plaintiffs are inmates in the custody of the Department of Corrections who claim that a statute and certain administrative policies enacted after their incarceration operate together to retroactively increase the length of their sentences, in violation of the Ex Post Facto Clause of the United States Constitution. We conclude that plaintiffs have failed to demonstrate an ex post facto violation and therefore affirm the trial court's award of summary judgment to the Department in each case.

## I. <u>Wool v. Pallito</u>, No. 2017-131

¶ 2.    Kirk Wool was convicted by jury in 1992 of two counts of aggravated sexual assault.  He is currently serving a sentence of twenty-nine to seventy-three years for these and other crimes.  His minimum sentence expired in January 2011 and his maximum sentence expires in December 2034.

¶ 3.    In December 2013, Wool filed a complaint for injunctive relief alleging that the Department violated the Ex Post Facto Clause by classifying him as a Level C offender, thereby denying him access to the programming necessary to be eligible for furlough and parole.[1]  He later amended his complaint to claim that the retroactive application of 13 V.S.A. § 5301(7), which categorized his offense as a "listed crime," increased his punishment by foreclosing the possibility of parole.[2]  In March 2017, the trial court granted summary judgment to the Department, ruling that this Court's decision in <u>Chandler v. Pallito</u>, 2016 VT 104, 203 Vt. 482, 158 A.3d 296, disposed of Wool's ex post facto claims.  Wool appealed.

## II. <u>Carter v. Menard</u>, 2017-274

¶ 4.    Bernard Carter is serving a sentence of thirty-five years to life for a 1992 aggravated sexual assault.  Carter's minimum sentence expired in May 2016.  In 2012, the Department determined that Carter had completed the paperwork necessary to enter sex offender treatment programming with a projected start date in May 2014.  Had he begun treatment at that time, he theoretically could have completed programming before his minimum sentence expired.  In 2013, however, the Department designated Carter as a Level C offender.  Since that time, based upon its

---

[1]  It appears from the record that Wool filed his initial complaint in anticipation of his classification being changed, and that he was not actually designated Level C until April 2014.

[2]  Section 5301(7) defines a category of "listed crimes" for purposes of the victims' rights statute, which gives victims of such crimes certain special rights.  See <u>infra</u>, ¶ 11.  Wool and Carter both also asserted initially that the enactment and application of 28 V.S.A. § 725 violated the Ex Post Facto Clause.  Neither plaintiff has pursued this latter argument on appeal; it is therefore waived.  <u>R. Brown & Sons, Inc. v. Int'l Harvester Corp.</u>, 142 Vt. 140, 142, 453 A.2d 83, 84 (1982).

own directives, the Department has not offered Carter the programming necessary to be eligible for furlough or to be recommended for parole.

¶ 5.    Carter had his first parole hearing in April 2016.  The Parole Board denied Carter's application, noting that Carter was a high-risk sex offender who needed sex offender treatment "to address risks in the community."  To improve his chances of being released on parole, the Board stated that Carter should successfully complete sex offender treatment programming and a period of time on conditional reentry, remain free of disciplinary violations, and obtain steady employment and an approved residence.

¶ 6.    Carter filed a complaint for injunctive relief against the Department in November 2015, alleging that the enactment and application of 13 V.S.A. § 5301(7) and the implementation of the Department's Level C directives retroactively increased his sentence in violation of the Ex Post Facto Clause.  In June 2017, the trial court granted summary judgment to the Department on the ground that Carter's case was controlled by our decision in Chandler v. Pallito, 2016 VT 104.  Carter appealed.  We consolidated his and Wool's appeals for purposes of oral argument and decision.

### III. Standard of Review

¶ 7.    We review summary judgment decisions de novo, using the same standard as the trial court.  In re Carter, 2004 VT 21, ¶ 6, 176 Vt. 322, 848 A.2d 281.  Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there exist no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Id.; V.R.C.P. 56(a).

### IV. Analysis

¶ 8.    On appeal, plaintiffs contend that the enactment of 13 V.S.A. § 5301(7) and the Department's Level C directives effectively eliminated the Department's discretion to provide plaintiffs with treatment programming prior to the expiration of their maximum sentences.

Without access to programming, they argue, they will not be considered for furlough or parole. Thus, they claim that the retroactive application to them of the statute and directives increases their punishment, in violation of the Ex Post Facto Clause.

¶ 9. The Ex Post Facto Clause prohibits a state from enacting a law that retroactively increases the punishment for a crime after it was committed. Collins v. Youngblood, 497 U.S. 37, 43 (1990); U.S. Const. art. I, § 10, cl. 1. "Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept." Garner v. Jones, 529 U.S. 244, 250 (2000). The "controlling inquiry" is "whether retroactive application of the change in . . . law created 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.' " Id. (quoting Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 509 (1995)). Although the United States Supreme Court has declined to articulate a specific formula for determining whether a given change in law is significant enough to violate the Ex Post Facto Clause, it has stated that a change that merely creates a "speculative and attenuated possibility" of increasing punishment is insufficient. Morales, 514 U.S. at 509.

¶ 10. Under the laws in effect in 1992—when plaintiffs committed the criminal acts that led to their incarceration—there were only two possibilities for early release, that is, release from incarceration prior to expiration of the maximum sentence. An offender was eligible to be released on parole after serving the minimum sentence, less any reductions in time for good behavior, if the Parole Board in its discretion decided that the offender could be released "without detriment to the community or himself." 28 V.S.A. § 501(a) (1983). A separate statute gave the Department discretion to grant an offender furlough for up to fifteen days for certain designated purposes, such as to contact a prospective employer or obtain a suitable residence for use upon discharge. 28 V.S.A. § 808(a) (1973). The Department also had the power to establish treatment programming and a system of classification for inmates, to make rules governing its treatment programs, and to periodically review programming decisions. 28 V.S.A. § 102(b)(2), (c)(1), (c)(8). Although the

4

Legislature has since expanded the options for early release, the statutes governing the Department's authority over treatment programming and classification are the same today as they were in 1992.

¶ 11. In 1999, the Legislature amended the victims' rights statute to add 13 V.S.A. § 5301(7), which created a category of "listed crimes." See 1999, No. 4, § 1. Victims of listed crimes are entitled to special rights, including the right to receive certain information about the offender and the right to testify at the offender's sentencing and parole eligibility hearings. 13 V.S.A. §§ 5305(c), 5314(b), 5321(d); 28 V.S.A. § 507. Aggravated sexual assault—the crime committed by plaintiffs—is a listed crime. 13 V.S.A. § 5301(7)(G).

¶ 12. In 2001, the Legislature enacted the conditional reentry statute, which gave the Department discretion to conditionally release an offender at the end of his or her minimum sentence. See 2001, No. 61, § 89 (codified at 28 V.S.A. §§ 721-726). If an offender convicted of a listed crime satisfactorily completed 180 days in the conditional reentry program, the Department could recommend to the Parole Board that the offender be released on parole. 28 V.S.A. § 725. The Parole Board retained the ultimate discretion to decide whether the offender should be released on parole, however. Id. § 502a. The Legislature further expanded the options for early release in 2005 when it gave the Department discretion to grant up to ninety days of reintegration furlough to an offender to evaluate the offender's fitness for reintegration into the community.[3] 2005, No. 63, § 6.

¶ 13. The Department responded to these legislative changes by adopting a series of directives that created a three-tiered prisoner classification system. Chandler, 2016 VT 104, ¶ 5. Under the system, each offender is designated by the Department as Level A, B, or C, "depending

---

[3] The statute has since been amended to remove any time limits on the amount of reintegration furlough the Department may grant an offender. 28 V.S.A. § 808(a)(6); 2011, No. 41, § 3.

on the Department's validated risk assessment of each offender and the offender's program needs." Id. "An offender's level of custody informs the creation of an offender's case plan and also affects the reentry options available to an offender." Id. The classification directives do not govern the Parole Board or limit or alter its discretion to release an offender after his minimum sentence expires.

¶ 14.    In this case, both plaintiffs have been designated as Level C offenders. To be classified as Level C under Directive 371.10, an offender must be convicted of a "listed offense." Listed offenses include the listed crimes defined in 13 V.S.A. § 5301(7) as well as several other violent crimes identified by the Department in a separate directive. In addition to being a listed offense, the offender's crime must be determined to be "egregious," based on certain specific criteria, and the offender must have a score of 24 or above on the Level of Services Inventory and a score of 7 to 9 according to the Violence Risk Assessment Guide. The directive requires the Department to review an offender's Level C classification upon the expiration of the offender's minimum term and every two years thereafter.

¶ 15.    A related directive, 371.11, explains how the Level C classification typically affects an offender's programming and reentry options:

> Case planning for Level C offenders will generally focus on long term confinement. Due to the nature of their offenses, victim harm and high risk profile these offenders must demonstrate long term behavioral and psychological stability, commitment to change, and completion of significant treatment goals prior to any release consideration. In these cases, the burden of demonstrating these objectives lies with the offender, and the Department will use the maximum release date, less six months, as the reference for case planning purposes.

The directive states that the Department will consider placing a Level C offender in programming after expiration of the minimum sentence if the offender's behavior has been "exemplary" and the Parole Board has indicated that parole will be considered after program completion.

6

¶ 16.     In <u>Chandler v. Pallito</u>, we considered whether the retroactive application of the Department's classification and programming system impermissibly increased the punishment of an inmate convicted prior to the enactment of the above statutes and directives.  The plaintiff in <u>Chandler</u> pleaded guilty in 1997 to aggravated sexual assault, kidnapping, and burglary, and was sentenced to serve twenty-five to sixty years.  As of 2008, Chandler was classified as a Level B offender, meaning that he could be eligible for conditional reentry after the expiration of his minimum sentence if he successfully completed required programming and the Department found release to be otherwise appropriate.  2016 VT 104, ¶ 6.  His case plan called for him to begin sex offender treatment programming in September 2009, well in advance of his minimum release date.

¶ 17.     In July 2009, the Legislature enacted a statute that prohibited a "high risk" sex offender from being released on furlough or parole until seventy percent of his or her maximum sentence was completed.  See 28 V.S.A. § 204b.  The Department subsequently designated Chandler as a high-risk sex offender.  It informed him that it would base his case plan on his anticipated maximum release date, effectively treating Chandler as a Level C offender and precluding him from participating in programming prior to his minimum.  A trial court later invalidated the application of the seventy-percent rule to Chandler on the ground that it violated the Ex Post Facto Clause.  However, the Department continued to deny Chandler access to treatment programming, stating that it would review his case every two years.

¶ 18.     Chandler filed a complaint alleging that the various statutes and administrative directives enacted after his incarceration violated the Ex Post Facto Clause because their retroactive application eliminated any opportunity for him to obtain parole or early release.  He argued that despite the trial court's invalidation of the application of the seventy-percent rule to his case, the Department had created the same result by denying him programming and, in turn, making him ineligible for conditional reentry, reintegration furlough, or parole at his minimum release date.  The trial court granted summary judgment to the Department.

7

¶ 19.  We affirmed.  Id. ¶¶ 1, 36.  We rejected Chandler's contention that the Department's decision to deny him sex offender treatment programming was improperly based on the same criteria it used to designate him "high risk" and to subject him to the seventy-percent rule.  Id. ¶¶ 26-28.  "[T]he use of similar language or 'findings' to delay plaintiff's programming and to evaluate plaintiff for the sex offender registry was not improper and, more important, is far too speculative to establish an ex post facto violation."  Id. ¶ 28.

¶ 20.  We further held that even if the Department relied upon improper criteria in designating Chandler as a Level C offender, he had not shown how the challenged statutes and administrative directives "altered or eliminated the Department's fundamental discretion over plaintiff's treatment programming and led to an increase in his sentence."  Id. ¶ 29.  When Chandler was incarcerated, conditional reentry and reintegration furlough did not yet exist.  Chandler was not eligible for parole until he served the minimum term of his sentence, and the Parole Board had broad discretion to grant or deny parole.  Id. ¶ 30 (citing 28 V.S.A. § 501 (1997)).  Similarly, the Department had discretion over whether to place Chandler in the sex offender treatment program.  Id.  Thus, although Chandler was eligible for parole after serving his minimum, "any early release was still dependent on the Department's discretion, as was any participation in treatment programming."  Id.

¶ 21.  We concluded that the enactment of the conditional reentry and reintegration furlough statutes and the related classification directives did not change Chandler's sentence range or alter the Department's "fundamental discretion" over his treatment programming.  Id. ¶ 31.  Instead, they simply permitted " 'a more careful and accurate exercise of the discretion the Board has had from the outset.' "  Id. (quoting Garner, 529 U.S. at 254).  Although we acknowledged that "this more flexible and accurate system 'seems certain to result in some prisoners serving extended periods of incarceration,' " we nevertheless concluded that "the 'significant risk' test

requires a more concrete demonstration that the statutes and directives retroactively increased plaintiff's sentencing range." Id. (quoting Garner, 529 U.S. at 255).

¶ 22. This case is squarely controlled by Chandler. At the time of plaintiffs' incarceration, their only options for early release were the brief furlough permitted by 28 V.S.A. § 808(a), or parole. Plaintiffs were not entitled to be considered for parole until their minimum sentence expired. The decision to grant or deny parole fell entirely within the discretion of the Parole Board. Moreover, the Department had broad discretion over whether to grant furlough and to allow them to participate in treatment programming. The subsequent statutory and administrative changes did not remove or limit the discretion vested in the Parole Board and the Department. See Chandler, 2016 VT 104, ¶ 34.

¶ 23. Plaintiffs argue that Chandler is distinguishable because their ex post facto claims are based upon 13 V.S.A. § 5301(7), which we did not directly address in Chandler.[4] As described above, § 5301(7) is a list of offenses that qualify as "listed crimes" for purposes of chapter 165 of Title 13, the victims' rights statute. The 1999 addition of § 5301(7) did not change the statutory punishment for any of the listed crimes. "Nor did the amendment alter the standards for determining either the initial date for parole eligibility or an inmate's suitability for parole." Garner, 529 U.S. at 251. The statute does not increase or even apply to the length of plaintiffs' incarceration, and therefore does not facially violate the Ex Post Facto Clause. See Chandler, 2016 VT 104, ¶ 25.

---

[4] Wool and Carter also attempt to distinguish Chandler on the ground that the plaintiff in that case was not designated Level C. See id. ¶ 9. It is true that Chandler's official classification level was unclear from the record. Id. ¶ 26 n.18. However, it appeared that he was being treated as a Level C offender for purposes of programming. Id. We accordingly assumed that the Department had categorized Chandler as a Level C offender in analyzing whether the classification directives altered Chandler's sentence or the Department's discretion over his programming. Id. ¶¶ 29-31. Thus, this is not a meaningful basis on which to distinguish Chandler.

9

¶ 24. Plaintiffs contend, however, that the Department has improperly used § 5301(7) to establish a category of offenders who are practically ineligible for release. This argument is unavailing. As the trial court found, "the only connection § 5301(7) has to [plaintiffs'] ex post [facto] claim is that the [Department] incorporates 'listed crimes' of § 5301(7) into a more expansive list of violent crimes that it considers when making a Level C designation." The Department could have created its own comprehensive list of violent crimes without referring to § 5301(7). The fact that it opted to use the list as a matter of convenience did not remove or limit its discretion over offender classification and programming. See 28 V.S.A. § 102(c)(1).

¶ 25. An examination of the classification system as a whole further undermines plaintiffs' argument that § 5301(7) is being used by the Department to retroactively punish offenders. The commission of a listed offense—which includes several other crimes besides those listed in § 5301(7)—is merely one of several factors the Department uses to determine whether an inmate should be designated Level C. See supra, ¶ 15. Moreover, an inmate convicted of a listed offense may be designated as Level A, B, or C. The inmate's classification level depends on his or her risk to reoffend and, for Level C, whether the crime is egregious. Level A inmates, even if they are convicted of listed offenses, will generally be released after the expiration of their minimum sentence. Level B inmates may also be released after their minimum sentences have expired if they have participated successfully in programming. Chandler, 2016 VT 104, ¶ 6. Thus, the link between § 5301(7)'s listed crimes and the length of plaintiffs' incarceration is attenuated, to say the least.

¶ 26. Further, plaintiffs have not shown that the Level C directives themselves removed or limited the Department's discretion over classification and treatment programming. We recognize that "the presence of discretion does not displace the protections of the Ex Post Facto Clause." Garner, 529 U.S. at 253. But as the United States Supreme Court explained in Garner:

10

> [T]o the extent there inheres in ex post facto doctrine some idea of actual or constructive notice to the criminal before commission of the offense of the penalty for the transgression, we can say with some assurance that where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions.

Id. (citation omitted).

¶ 27. The Department's discretion over access to treatment programming and furlough is similarly subject to changes in the way it is exercised. The Level C directives may have altered the manner in which the Department exercises its discretion, but they did not eliminate or limit that discretion. "Although the focus of Level C is long term confinement, Level C offenders are not entirely foreclosed from the conditional reentry and reintegration furlough programs; similarly, Level C offenders are still eligible for traditional parole." Chandler, 2016 VT 104, ¶ 8. The directives require the Department to review an offender's Level C status every two years.[5] Further, the Department may, in its discretion, place a Level C offender in programming after his or her minimum sentence has expired if that offender's behavior has been "exemplary." The classification system allows the Department to put its limited resources to better use by offering programming to those offenders who demonstrate a good possibility of early release. In this way,

---

[5] Wool asserts that the two-year reviews are a "sham" and that the trial court abused its discretion by denying him the opportunity to conduct discovery into how the Department conducts these reviews. This claim is unsupported by any citations to law or the record, apart from a citation to Wool's own assertion in a trial court filing that the court should have given him the opportunity to discover "just how the Level C designation is carried out and applied." Wool fails to demonstrate that he timely requested such discovery or that the trial court prohibited him from obtaining it. "Even with the 'wider leeway' afforded to pro se litigants, this argument does not meet the minimum standards required by Vermont Rule of Appellate Procedure 28(a)(4)." Pcolar v. Casella Waste Sys., Inc., 2012 VT 58, ¶ 19, 192 Vt. 343, 59 A.3d 702 (citation omitted); see also In re S.B.L., 150 Vt. 294, 297, 553 A.2d 1078, 1081 (1988) (explaining that this Court "will not comb the record searching for error").

11

the directives simply "permit a more careful and accurate exercise of the discretion [the Department] has had from the outset." Garner, 529 U.S. at 254.

¶ 28.   When, as here, the challenged law or administrative policy does not by its terms show a significant risk of increased punishment, "the [plaintiff] must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." Garner, 529 U.S. at 255 (emphasis added).  In other words, the plaintiff must demonstrate that a prisoner similar to him would likely have been released on parole at his minimum but for the new rules.    See Cimaszewski v. Bd. of Prob. & Parole, 868 A.2d 416, 427 (Pa. 2005) (explaining that to demonstrate ex post facto violation under Garner and Morales, inmate must show that under previous parole law, "the Board would likely have paroled the inmate.").

¶ 29.   Neither plaintiff has met this burden.  There is no evidence in the record that under the laws in effect in 1992, inmates like plaintiffs who were convicted of serious violent offenses and were determined to pose a high risk of reoffending would have been released at their minimum even if they completed programming.  Plaintiffs therefore have failed to demonstrate that the practical implementation of the new directives created more than a speculative or attenuated possibility of increasing their punishment.  In the absence of such a showing, plaintiffs' ex post facto claims cannot prevail, and the trial court appropriately granted summary judgment in favor of the Department.  See Chandler, 2016 VT 104, ¶ 36.

Affirmed.

FOR THE COURT:

_____

Associate Justice

12